IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA,

                        Plaintiff,

      v.

COURTNEY FOSTER,

                        Defendant.

No. 3:18-cr-00307-HZ-1

AMENDED OPINION & ORDER

Rachel K. Sowray
Scott E. Bradford
United States Attorney's Office
1000 S.W. Third Avenue, Suite 600
Portland, OR 97204

        Attorneys for Plaintiff

Ernest Warren , Jr.
Warren & Sugarman
838 S.W. First Avenue, Suite 500
Portland, OR 97204

Elizabeth Gillingham Daily
Office of the Federal Public Defender
101 SW Main Street
Suite 1700
Portland, OR 97204

     Attorneys for Defendant

HERNÁNDEZ, District Judge:

     Defendant Courtney Foster moves for a reduction of her sentence to time served under 18 U.S.C. § 3582 or, alternatively, to serve the remainder of her sentence in home confinement. The Government opposes Defendant's motion. The Court grants Defendant's motion in part.

## BACKGROUND

     The Government charged Defendant with Fraud in Connection With Access Devices and Aggravated Identity Theft. After Defendant pleaded guilty to the charges against her, the Court sentenced Defendant to a total of thirty-six months of imprisonment and three years of supervised release. Judgment 2–3, ECF 55. The Court ordered Defendant to self-surrender to BOP on or before June 13, 2019. *Id.* Defendant has served one year of her sentence. *Id.*

## STANDARDS

     A federal district court generally "may not modify a term of imprisonment once it has been imposed[.]" 18 U.S.C. § 3582(c); *see also Dillon v. United States*, 560 U.S. 817, 824–25 (2010). With the passage of the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5191 (2018), Congress authorized the district court to modify a defendant's sentence on a motion for compassionate release by a defendant:

> [T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment . . .

after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—

> (i)  Extraordinary and compelling reasons warrant such a reduction; [. . . ]

> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

18 U.S.C. § 3582(c)(1)(A).

The policy statement issued by the United States Sentencing Commission identifies four categories of extraordinary and compelling reasons: (A) the medical condition of the defendant; (B) the age of the defendant; (C) family circumstances, including "death or incapacitation of the caregiver of the defendant's minor child"; and (D) other reasons, as determined by the Director of the Bureau of Prisons, that amount to an extraordinary and compelling reason "other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 app. n.1(A)–(D).

The policy statement also requires the Court to determine whether the circumstances warrant a reduction (and, if so, the amount of reduction), after considering the factors set forth in 18 U.S.C. § 3553(a) and whether the defendant is a danger to the safety of any other person or to the community. U.S.S.G. § 1B1.13(4).

The defendant seeking a sentence reduction bears the burden to establish that the defendant has exhausted his or her administrative remedies and that extraordinary and compelling reasons exist to warrant a reduction of his or her sentence. *See* 18 U.S.C. § 3582(c)(1)(A); *United States v. Greenhut*, 2:18-CR-00048-CAS-1, 2020 WL 509385, at *1 (C.D. Cal. Jan. 31, 2020) (holding that a defendant bears the burden of establishing entitlement to sentencing reduction and citing *United States v. Sprague*, 135 F.3d 1301, 1306–07 (9th Cir. 1998)).

///

## DISCUSSION

### I.    Exhaustion of Administrative Remedies

There is no dispute that Defendant has exhausted her administrative remedies.

### II.    Extraordinary and Compelling Reasons

Defendant is thirty-six years old and housed at Federal Correctional Institution ("FCI") Dublin. Def. Mot. Ex. C at 1, ECF 70. Defendant's projected release date is August 31, 2021. Def. Mot. Ex. D. at 2, ECF 70. FCI Dublin houses 808 inmates, not including the inmates it houses at a satellite camp.[1] Currently, there are four active inmate cases of COVID-19[2] at FCI Dublin.[3] Nationwide, the Federal Bureau of Prisons ("BOP") has a positivity rate of over twenty-four percent,[4] compared to a positivity rate of eight percent in the general population.[5]

---

[1] Federal Bureau of Prisons, *FCI Dublin*, available at https://www.bop.gov/locations/institutions/dub/ (last accessed Sept. 12, 2020).

[2] Federal Bureau of Prisons, *COVID-19 Cases*, FCI Dublin, available at https://www.bop.gov/coronavirus/ (last accessed Sept. 16, 2020)

[3] It is important to note, however, that BOP does not report how it determines whether to test inmates for COVID-19. *See, e.g., United States v. DeMille*, No. 3:18-cr-149-SI, 2020 WL 2992190, at *5 n. 2 (D. Or. Jun. 4, 2020) ("The BOP's information, however, is of limited value. The BOP does not disclose whether or to what extent this facility is testing symptomatic or asymptomatic inmates, both or neither.") (citing *United States v. Pabon*,  2020 WL 2112265, at *5 (E.D. Pa. May 4, 2020), in which the court cited Johns Hopkins Bloomberg School of Public Health Professor Leonard Rubenstein to explain the link between testing and limiting the spread of COVID-19: "Unless you do universal testing in all environments, the risk of spread is enormous. If you are waiting for symptoms to emerge before you do the testing, you are getting a false picture of what is going on . . . It's too late."); *see also Arias v. Decker*, No. 20 Civ. 2802 (AT), 2020 WL 2306565, at *8 (S.D.N.Y. May 8, 2020) ("[W]hen it comes to vulnerable detainees . . . monitoring them for signs of infection is too little, too late.").

[4] Federal Bureau of Prisons, *COVID -19 Inmate Test Information*, available at https://www.bop.gov/coronavirus/ (last accessed Sept. 16, 2020) (reporting that 13,447 of 54,038 tests completed were positive)

[5] Centers for Disease Control and Prevention, *CDC COVID Data Tracker*, available at https://covid.cdc.gov/covid-data-tracker/?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fcases-updates%2Ftesting-in-us.html#testing_testsperformed (last accessed Sept. 16, 2020).

Defendant has a medical history of asthma since childhood, a ten-year history of cigarette smoking, a history of methamphetamine use, a recent history of upper respiratory infections, possible rheumatoid arthritis, symptoms that may suggest chronic obstructive pulmonary disorder (COPD), and symptoms consistent with cardiac problems. *Id*. at 1–3. Defendant uses an albuterol inhaler to treat her asthma up to four times a day. Def. Mot. Ex. B at 71, ECF 70. Defendant reported to FCI Dublin's medical staff that she received treatment for rheumatoid arthritis before her incarceration. Defendant received inconclusive lab test results when the BOP tested her for rheumatoid arthritis during her incarceration at FCI Dublin. Def. Mot. Ex. B at 1-2, Ex. C at 2–3.

Citing Centers for Disease Control and Prevention data, Defendant's expert, Dr. Chubbuck, opined that Defendant's asthma, history of cigarette smoking and methamphetamine use, and recent upper respiratory infections put Defendant "at increased risk of a poor outcome should she be infected with SARS-CoV-2, the virus that causes COVID-19." Def. Mot. Ex. C at 2–3. Dr. Chubbuck also expressed concern that Defendant needs further diagnostic testing for her reported history of rheumatoid arthritis, pulmonary testing, and cardiac testing, which FCI Dublin has not provided. *Id*. Dr. Chubbuck noted that Defendant had experienced symptoms suspicious for COVID-19 in February and May 2020, but FCI Dublin's medical staff did not provide Defendant COVID-19 testing when she reported those symptoms. *Id*.

The Court finds that the combination of Defendant's health conditions and the existence of active COVID-19 cases at FCI Dublin are extraordinary and compelling reasons to modify Defendant's sentence. The CDC has advised that moderate-to-severe asthma and cigarette

smoking may be risk factor for poor prognosis in patients with COVID-19.[6] for Defendant has had asthma since childhood and has used inhalers and a nebulizer to treat her asthma. Def. Mot. Ex. B at 71. At her most recent sick call visit, BOP Health Services diagnosed Defendant with exercise-induced asthma. *Id*. Defendant's recent medical history is also significant for upper respiratory illnesses in January and February 2020. Ex. B at 92; Ex. C at 1–2. The severity of Defendant's asthma is undocumented in the record. *See, e.g.,* Ex. B at 71.

Besides her asthma, Defendant has a history of methamphetamine use and smoking. She also has other complaints that could suggest cardiac or other pulmonary disorders, but she has not received treatment to diagnose or investigate those complaints. On May 1, 2020, Defendant presented to sick call with shortness of breath while laying down, increased phlegm, an elevated heart rate, and decreased breath sounds. Ex. B at 71; Def. Mot. Ex. C at 1–2. Despite her symptoms, FCI Dublin did not administer her a SARS-CoV-2 test. Ex. C at 2. Defendant received a chest x-ray and inhaler to treat her asthma, but she received no further treatment to rule out other pulmonary or cardiac causes of her symptoms. *Id*.

Dr. Chubbuck opined that FCI Dublin's decision not to test Defendant suggests that its infection control practices may be inadequate. *Id*. If Defendant has undiagnosed pulmonary or cardiac conditions such as heart failure, which is consistent with her history of methamphetamine use and trouble breathing while laying down, her risk of a poor outcome if she contracts COVID-19 is higher. Ex. *Id*.

---

[6] Centers for Disease Control and Prevention, *People With Certain Medical Conditions*, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last accessed Sept. 16, 2020).

Defendant has a self-reported history of rheumatoid arthritis and a family history of rheumatoid arthritis, which FCI Dublin has not treated during her incarceration at FCI Dublin. She received an inconclusive rheumatoid arthritis test result, but no further workup for rheumatoid arthritis which, left untreated, could lead to irreversible joint damage. Ex. B at 1; Ex. C at 2–3. Dr. Chubbuck noted that the interaction between COVID-19 and autoimmune diseases like rheumatoid arthritis is poorly understood. *Id.* at 3.

The Court finds that Defendant has met her burden to establish that extraordinary and compelling reasons exist to reduce her sentence. The combination of Defendant's risk factors of smoking, methamphetamine use, and asthma, the active COVID-19 infections at FCI Dublin, BOP's failure to administer a COVID-19 test when Defendant reported symptoms commonly associated with COVID-19, and Defendant's need for further evaluation of her reported pulmonary, autoimmune, and cardiac symptoms create a risk of severe illness and potentially death.

### III.    18 U.S.C. § 3553(a) Sentencing Factors

When a court has determined that extraordinary and compelling reasons warrant a reduction of the defendant's sentence, the court must then determine whether the defendant remains a danger to others or to the community under 18 U.S.C. § 3142(g) and whether compassionate release is consistent with the sentencing factors in 18 U.S.C. § 3553(a). U.S.S.G. § 1B1.13. The factors considered by the court when deciding whether a defendant is a danger to the safety of any other person or to the community are (1) the nature and circumstances of the offense (including whether the offense is a crime of violence, a violation of 18 U.S.C. § 1591, a federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device); (2) the weight of the evidence; (3) the history and

characteristics of the defendant (including, among other things, the defendant's character, physical and mental condition, and family ties and whether at the time of the offense or arrest the defendant was on probation, parole, or other release); and (4) the nature and seriousness of the danger to any person or the community posed by the defendant's release. 18 U.S.C. § 3142(g).

Defendant argues that she no longer poses a threat to any other person or the community. She argues that her former methamphetamine use contributed to the crimes for which she is incarcerated, and she has availed herself of all rehabilitation opportunities available to her. Defendant further argues that her current offense and prior criminal history consist of non-violent crimes of drug possession and theft. The Government argues that Defendant is not entitled to compassionate release because she has an extensive criminal history and she received a sentence below the guidelines range. Gov't Resp. 8, ECF 72.

Defendant's conviction arose from her involvement in a ten-person credit card fraud conspiracy in which Defendant used credit cards, debit cards, and gift cards printed with stolen account numbers to purchase items from stores, which other co-defendants in the case resold. Compl. ¶ 5, ECF 1. Defendant's involvement in the conspiracy, according to the Government, was "the lowest of everyone[.]" Sentencing Tr. 4:15, ECF 57. Defendant essentially acted as a gofer, and co-defendants paid her with money or drugs for buying items with the fraudulent access devices and delivering the items to co-defendants. *Id*. 4:17–21. At her sentencing, Defendant took responsibility for her crimes, expressed remorse, and told the court that she had never received help with her drug addiction before the Government charged her. *Id*. 11:3–7.

Before her sentencing, Defendant completed a three-month inpatient substance abuse treatment program. Def. Mot. Ex. I. After that Defendant lived in a clean and sober house for seven months and participated in additional outpatient programming before her sentencing. *Id*.

She could not continue her drug rehabilitation treatment at FCI Dublin because she did not have enough time remaining on her sentence to qualify for the Residential Drug Abuse Program.

Defendant completed a construction contractor program before her sentencing. Def. Mot. Ex. A at 6, ECF 70. During her incarceration at FCI Dublin, Defendant worked as a telemarketer, worked in the laundry facility, and has earned all available good conduct time credit. She has also completed several adult education classes. Defendant became eligible for placement in a community correctional facility on August 31, 2020. Def. Mot. 14.

Under the circumstances, the Court finds that Defendant no longer remains a danger to any other person or to the community. Defendant's prior drug use was a contributing factor to her crime, and she has made strides toward sobriety since. Defendant has family support and a release plan approved by United States Probation that involves living with her grandfather and other family members in Illinois. Def. Mot. Ex. H. Because she has served only one year of her three-year sentence, which represented a significant downward departure from the guidelines range after considering the section 3553(a) factors, the Court finds that a reduced sentence is appropriate.

## CONCLUSION

The Court's September 29, 2020, Opinion and Order [77] is STRICKEN. Defendant's Motion to Reduce Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) is GRANTED IN PART. After a fourteen-day period of pre-release quarantine to start on the date of this Amended Opinion and Order, Defendant will begin the three years of supervised release previously ordered by the Court with the following additional conditions of release: (1) Defendant will spend up to 120 days of her supervised release in a residential re-entry center, and the next four months of supervised release in home detention. During the four-month period of home detention,

Defendant will be restricted to her approved residence at all times, except for medical

necessities, court appearances, or other activities specifically pre-approved by the Court.

IT IS SO ORDERED.


DATED: ____October 2, 2020____.



_Marco Hernandez_
MARCO A. HERNÁNDEZ
United States District Judge